UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
Case No.: 06-20979-CIV-JORDAN/KLEIN

COMMODITY FUTURES TRADING )
COMMISSION, )
)
       Plaintiff, )
)
v. )
)
)
FIRST INTERNATIONAL GROUP, INC., )
MICHAEL MESA, and TOM KEESEE, )
)
       Defendants. )
)

**CONSENT ORDER OF PERMANENT INJUNCTION AND OTHER
EQUITABLE RELIEF AGAINST DEFENDANT MICHAEL MESA**

I.   **BACKGROUND**

On April 17, 2006, the Commodity Futures Trading Commission ("Commission") filed a Complaint against First International Group, Inc. ("First International"), Michael Mesa ("Mesa") and Thomas Keesee ("Keesee") (collectively, the "Defendants"). The Complaint charged Defendants, among other things, with violating Section 4c(b) of the Commodity Exchange Act, as amended (the "Act"), 7 U.S.C. § 6c(b) (2002), and Commission Regulations 1.1(b)(1), 1.1(b)(3), 32.9(a) and 32.9(c), 17 C.F.R. §§ 1.1(b)(1), 1.1(b)(3), 32.9(a) and 32.9(c) (2006).

II.   **CONSENT AND AGREEMENT**

To effect settlement of the matters alleged in the Complaint as to Defendant Mesa without a trial on the merits or any further judicial proceedings, Defendant Mesa:

    1.   Consents to the entry of this Consent Order of Permanent Injunction and Other Equitable Relief ("Consent Order");

2. Affirms that he has read and agreed to this Consent Order voluntarily, and that no threat or promise has been made by the Commission or any member, officer, agent or representative thereof, or by any other person, to induce consent to this Consent Order, other than as set forth specifically herein;

3. Acknowledges service of the Summons and Complaint;

4. Admits that this Court has jurisdiction over him and the subject matter of this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2002);

5. Admits that venue properly lies with this Court pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2002);

6. Waives:

   a. All claims which may be available under the Equal Access to Justice Act (EAJA), 5 U.S.C. § 504 (2002) and 28 U.S.C. § 2412 (2002) to seek costs, fees, and other expenses relating to, or arising from, this action;

   b. Any claim of double jeopardy based upon the institution of this proceeding or the entry in this proceeding of any order imposing a civil monetary penalty or any relief; and

   c. All rights of appeal from this Consent Order;

7. Consents to the continued jurisdiction of this Court in order to implement and carry out the terms of all orders and decrees that may be entered herein, to assure compliance with the Consent Order and for all other purposes related to this action;

8. Agrees that neither he nor any of his agents, servants, employees, contractors or attorneys shall take any action or make any public statement denying, directly or indirectly, any allegation in the Complaint or contained in this Consent Order or creating, or tending to create,

the impression that the Complaint or this Consent Order is without a factual basis; provided, however, that nothing in this provision shall affect Mesa's (a) testimonial obligations; or (b) right to take legal positions in other proceedings to which the Commission is not a party. Mesa shall take all necessary steps to ensure that all of his agents, servants, employees, contractors and attorneys understand and comply with this agreement;

9. By consenting to the entry of this Consent Order, Mesa neither admits nor denies the allegations of the Complaint or the Findings of Fact and Conclusions of Law contained in this Consent Order, except as to jurisdiction and venue, which he admits. Mesa consents to the entry of this Consent Order solely for the purpose of settling this case;

10. Solely with respect to any bankruptcy proceeding relating to Mesa or any proceeding to enforce this Consent Order, Mesa agrees that the allegations of the Complaint and the findings in this Consent Order shall be taken as true and correct and be given preclusive effect, without further proof. Furthermore, Mesa agrees to provide immediate notice to this Court and the Commission by certified mail of any bankruptcy proceeding filed by, on behalf of, or against him, individually or collectively; and

11. Mesa voluntarily undertakes never to apply for registration or to claim exemption from registration with the Commission in any capacity, and not to engage in any capacity requiring such registration or exemption from registration, except as provide for in Commission Regulation § 4.14(a)(9), 17 C.F.R. § 4.14(a)(9), and not to act as a principal, agent, officer or employee of any person registered, exempted from registration or required to be registered with the Commission, unless such exemption is pursuant to Commission Regulation § 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2006).

### III. FINDINGS AND CONCLUSIONS

The Court, being fully advised in the premises, finds that there is good cause for the entry of this Consent Order and that there is no just reason for delay. The Court therefore directs, without a trial on the merits or any further judicial proceedings or presentation of evidence, the entry of findings of fact, conclusions of law, and a permanent injunction and ancillary equitable relief pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2002), as set forth herein.

#### A. Findings of Fact

1. From at least June 2004 through at least December 2005 (the "relevant time period"), Mesa solicited retail customers through telephone calls to purchase and sell foreign currency option contracts as an employee of First International.

2. During the relevant time period, 96% of First International's customers lost money on their investments.

3. First International, through its employees, including Mesa, made false and misleading material representations to prospective and existing customers by making false and misleading claims that First International had a successful and highly profitable trading record.

4. First International representatives, including Mesa, told actual and prospective customers that they could make quick and substantial profits with no risk. These claims falsely conveyed that First International customers would likely make profits. For example, claims by Mesa included the following:

- Mesa stated that "this is a good time to buy the Euro because it is about to go up and there was no way to lose money because even if it goes down we make money;" and

4

- Mesa stated to another customer that "he could not lose with First International's trading strategy."

Contrary to the message conveyed by such claims, over 93% of First International's customers closed their accounts at a loss and approximately two-thirds lost over 95% of their investment. Mesa had access to customer accounts and therefore had knowledge that customers were not profiting from trading through First International.

5. The minimization of risk by First International brokers, including Mesa, was a component of the initial sales pitch.

6. Shortly after customers invested, sometimes within a matter of days, First International telemarketers called customers back and enthusiastically recommended investing more funds to take advantage of the market. This was the "reload" stage of the fraudulent scheme employed by First International brokers, including Mesa.

7. If a First International customer hesitated during the "reload" solicitation to send more funds, he was typically transferred to Mesa. First International brokers introduced Mesa as the "lead trader" at First International and someone who had years of experience and success in trading. Mesa told one customer that you could make "lots of money trading in foreign currency if you know how" and that he had been trading a long time. Mesa then told the customer that "now is a good time to buy the Euro because it has nowhere to go but up" and also stated that "there is no way to lose money because he would put 'strangles'" on the trades.

8. In another example, Mesa advised another customer that there was no way to lose money because "even if the market goes down, we make money." Mesa continuously stressed there was no risk with the trades he recommended. According to the customer, Mesa stated that

5

any other discussion of risk was mentioned because it was "something the law says we have to say." Mesa told another customer that he would protect her investment by using "straddles."

9. While prospective customers of First International were told of the great profit potential if they invest with First International, they were never told that the vast majority of First International's customers closed their accounts at a loss. Over 93% of First International's customers closed their accounts at a loss and approximately two-thirds lost over 95% of their investment trading through First International. Customers relied almost exclusively upon the recommendations of First International employees, including Mesa, when investing.

9. Mesa knew that his statements to actual and prospective customers regarding actual or likely profits, and his statements minimizing risks, were false, or he made them with reckless disregard for the truth, because he had access to customers' accounts and he knew that an overwhelming majority of First International's customers closed their accounts at a loss. Further, Mesa's failure to disclose the material fact that an overwhelming majority of First International customers closed their accounts at a loss, was a material omission given that he made claims to actual and prospective customers that conveyed that profits were possible.

10. After investing additional funds, First International customers were typically unable to get in touch with Mesa or any other broker at First International. Customers were told that they could access their accounts online, however this was rarely true. Even if customers could obtain their statement, usually no one was available from First International to explain how to read the statements. When customers called to ask questions or to speak with Mesa they were told that Mesa was "busy trading" or was out of the office.

11. From June 2004 until approximately January 2005, Safeguard FX LLC ("Safeguard") was the clearing firm for First International.

6

12. From approximately January 2005 through January 2006, First International cleared through United Clearing LLC ("United Clearing"), a registered futures commission merchant ("FCM").

### B. Conclusions of Law

1. This Court has jurisdiction over the subject matter of this action and all parties hereto pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, which authorizes the Commission to seek injunctive relief against any person whenever it shall appear that such person has engaged, is engaging or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation or order thereunder.

2. Under Section 2(c)(2)(B)(i) and (ii) and 2(c)(2)(C) of the Act, 7 U.S.C. §§ 2(c)(2)(B)(i) and (ii) and 2(c)(2)(C) (2002), the Commission has jurisdiction over foreign currency transactions if (1) the transactions at issue are futures or option contracts; (2) the futures or options contracts were offered to, or entered into with, a person who is not an eligible contract participant; and (3) if the counterparty to the transaction is an improper counterparty or, if the counterparty is a FCM or a certain FCM affiliate, fraud or manipulation is alleged in the transaction.

3. In this case, Mesa as an employee of First International offered foreign currency option contracts through oral solicitations. Thus, the first element to establish jurisdiction is satisfied. As to the second element, Section 1a(12)(A)(xi) of the Act defines an eligible contract participant as either (1) an individual who has total assets in excess of ten million dollars ($10,000,000) or (2) an individual who has total assets in excess of five million dollars ($5,000,000) and who enters the transaction to manage the risk associated with the asset he owns or liability incurred. Most if not all of Mesa's customers were not eligible contract participants.

7

4.  The third element to establish jurisdiction is satisfied with respect to the First International/Safeguard transactions because Safeguard, the clearing firm for First International from June 2004 until approximately January 2005, was not a proper counterparty under the Act. Section 2(c)(2)(B)(ii) of the Act, 7 U.S.C. § 2(c)(2)(B)(ii), identifies regulated entities that are proper counterparties to foreign currency transactions with retail customers, which include registered FCMs and certain statutorily defined affiliates of registered FCMs for whom the FCMs are required under the Act and Regulations to make and keep records. From January 2004 to approximately January 2005, Safeguard was listed with the National Futures Association as a "principal" of Safeguard Financial Holdings, LLC, a registered FCM, and claimed the status of an affiliate of a FCM. However, Safeguard did not qualify as an affiliate under Section 2(c)(2)(B)(ii)(III) of the Act, 7 U.S.C. § 2(c)(2)(B)(ii), because Safeguard Financial Holdings, LLC did not hold sufficient amounts of customer segregated funds and did not have a sufficient amount of adjusted net capital, so as to be required to make and keep records pursuant to Section 4f(c)(2)(B) of the Act, 7 U.S.C. § 6f(c). Thus, Safeguard was not an affiliate within the meaning of Section 2(c)(2)(B)(ii) of the Act, 7 U.S.C. § 2(c)(2)(B)(ii), and the entire Act applies to such Safeguard transactions.

5.  The third element to establish jurisdiction is also established with respect to the First International/United Clearing transactions, because while United Clearing was a proper counterparty, fraud is alleged in the transactions. For the time period from approximately January 2005 through January 2006, First International cleared through United Clearing, a registered FCM. By operation of Section 2(c)(2)(C) of the Act, 7 U.S.C. § 2(c)(2)(C), the Commission retains anti-fraud jurisdiction over the First International/United Clearing foreign currency option transactions under Section 4c(b) of the Act, 7 U.S.C. § 6(c)(B), and Commission