UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
Case No.: 06-20979
CIV-JORDAN/Klein

COMMODITY FUTURES TRADING )
COMMISSION, )
)
           Plaintiff, )
)
v. )
)
)
FIRST INTERNATIONAL GROUP, INC., )
MICHAEL MESA, and TOM KEESEE, )
)
           Defendants. )
)
)

**CLOSED CIVIL CASE**

## ORDER OF DEFAULT JUDGMENT, PERMANENT INJUNCTION AND ANCILLARY RELIEF AGAINST DEFENDANT FIRST INTERNATIONAL GROUP, INC.
### AND ORDER CLOSING CASE

This matter is before the Court on the motion of plaintiff United States Commodity Futures Trading Commission ("CFTC") for entry of a final judgment by default for permanent injunction against defendant First International Group, Inc. ("First International") and for ancillary relief directing the First International to pay restitution, disgorgement and a civil monetary penalty. On April 17, 2006, the CFTC filed a Complaint against First International, Michael Mesa ("Mesa") and Thomas Keesee ("Keesee") seeking injunctive and other equitable relief for violations of the Commodity Exchange Act, as amended ("Act"), 7 U.S.C. §§ 1 et seq. (2002) and the Commission's Regulations promulgated thereafter, 17 C.F.R. §§ 1 et seq. Based on the failure of First International to answer or otherwise appear in this proceeding, the CFTC is entitled to a final judgment by default for permanent injunction and ancillary relief of restitution, disgorgement, and civil monetary penalties.

This Court having considered the entire record in this matter, including the Complaint, the CFTC's *Motion For Statutory Ex Parte Restraining Order, Preliminary Injunction, and Other Equitable Relief* containing sworn testimonial evidence supporting the allegations in the Complaint and the relief requested, and the *Motion for Entry of Final Judgment By Default Against Defendant First International Group, Inc. for Permanent Injunction and Setting Amounts For Restitution, Disgorgement, and Civil Monetary Penalties* containing calculations for restitution, disgorgement, and civil monetary penalties. Accordingly, the Court makes the following findings of fact and conclusions of law, directs the entry of a permanent injunction, and imposes ancillary relief for restitution, disgorgement, and civil monetary penalties.

## I.

## FINDINGS OF FACT

**A.   First International is in Default**

1. On June 9, 2006, pursuant to Federal Rule of Civil Procedure 4(h)(1), First International was served with the Complaint and the Summons and other papers in this matter by service through the Florida Secretary of State. The service affidavit for First International was filed with the Court on June 22, 2006 (D.E. 20).

2. To date, First International has not answered or otherwise pleaded in response to the Complaint. On July 7, 2006, the Clerk of the Court lodged an Entry of Default as to First International (D.E. 27).

3. During the relevant time period as alleged in the Complaint ("relevant period"), First International was a Florida corporation. Its principal place of business during the relevant period was an office at 1001 Brickell Bay Drive, Suite 2110, Miami, Florida. First International has never been registered with the Commission in any capacity. (Complaint, ¶ 16).

4. Defendant First International is neither an infant nor an incompetent person, and is not eligible for relief under the *Soldiers' and Sailors' Civil Relief Act of 1940* (50 U.S.C. Appendix, § 501 *et seq.*).

5. Defendant First International is a corporate entity. No appearance has been entered by counsel on behalf of defendant First International, and as a corporate entity it may not appear or otherwise plead *pro se* in this litigation.

6. The Clerk of the Court has entered a default against defendant First International pursuant to Fed. R. Civ. P. 55 based on its failure to appear in this proceeding. The allegations in the Complaint as to defendant First International is deemed admitted based on its failures to appear or defend in this proceeding.

**B.     First International Committed Fraud**

7. From at least June 2004 through at least January 2006 ("the relevant time period"), defendant First International, through sales representatives, solicited and accepted funds from retail customers to purchase and sell foreign currency options contracts ("forex options"). In the solicitations First International sales representatives made false and misleading claims to retail public customers and prospective customers by: (1) exaggerating the magnitude and likelihood of potential profit and downplaying the risk of loss from investing in foreign currency options contracts; (2) representing that their trade recommendations would result in large profits within short periods of time; and (3) failing to inform customers and prospective customers that the vast majority of its customers who traded closed their accounts at a loss, while making statements of the potential for huge profits. (Complaint, ¶¶ 2, 19, 20).

8. While First International sales representatives made sanguine predictions of near certain profits, the vast majority of its customers suffered significant account losses. During the

3

relevant time period, nearly 97% of First International's customers lost money and approximately two thirds lost over 95% of their investment. During this period First International had at least 416 individual customer accounts and 422 trading accounts. Deposits for the 422 accounts totaled $7,079,084.11 with net trading loss of $6,109,585.80, including commission charges totaling $3,184,785. (Complaint, ¶ 31; Exhibit A to CFTC Motion for Default Judgment, Dec. of Kyong J. Koh, ¶ 3 (b), (c), (e) and (f)).

9. First International acted as the soliciting or introducing firm, and Safeguard FX, LLC ("Safeguard") or United Clearing, LLC ("United Clearing") acted as the counterparty to retail foreign currency option transactions. Customers were told to send their funds to Safeguard or United Clearing, but were not told the exact relationship between First International and Safeguard or United Clearing. (Complaint, ¶¶ 11, 21).

10. First International customarily operated to defrauded customers through a two step sales process: the initial telephone sales pitch leading to an option purchase, followed up by the "reload" in which customers were subject to a second round of high pressure sales pitches, usually through a new sales representative.

11. In the initial cold call, sales representatives claimed that First International specialized in foreign currency options and that by acting quickly customers could make substantial profits with no risk. These claims falsely conveyed that First International customers would likely make profits. For example, one customer was told that he could not lose with First International's trading strategy, while another customer was told he could easily double his money. Another customer was told there was "no easier, faster way to make money." (Complaint, ¶¶ 22, 24).

4

12. The minimization of risk by First International sales representatives was a component of the initial sales pitch with sales representatives telling customers that the Eurodollar was predictable, unlike the stock market, and that there was very little risk and that the suggested option purchase was a "can't fail" method to make money. (Complaint, ¶¶ 25-26).

13. Soon after customers had opened an account, First International brokers would call back and enthusiastically recommend investing more funds. At the same time First International sales representatives always stressed the urgency of market conditions and that customers needed to invest immediately to take advantage of the favorable market conditions. (Complaint, ¶¶ 19-20).

14. If a customer hesitated during the "reload" solicitation to send more funds, he/she was transferred to the "Lead Trader," someone who purportedly had years of experience and success trading. The Lead Trader would, for example, inform the customer that now was a good time to buy the Euro because it had no where to go but up and advise the client that there was no way to lose money because the proposed "straddles" or "strangles" would protect the customer's trades. (Complaint, ¶ 29).

15. While prospective customers were told of the great profit if they invested with First International, they were never told that the vast majority of First International's customers close their accounts at a loss. Almost 97% of First International's customers closed their accounts at a loss, and over two-thirds lost over 95% of their investment trading through First International. Customers relied almost exclusively upon the recommendations of First International employees when investing. (Complaint, ¶ 31; Exhibit A to CFTC Motion for Default Judgment, Dec. of Kyong J. Koh, ¶ 3 (h)).

### C. The Court Has Jurisdiction and Venue is Proper

15. This Court has jurisdiction over this action pursuant to Sections 2(c)(2)(B) and 6c of the Act, 7 U.S.C. § 13a-1, which authorizes the Commission to seek injunctive relief against any person whenever it shall appear to the Commission that such person engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation or order pursuant to the Act. (Complaint, ¶ 8).

16. Venue properly lies with this Court pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1(e), because First International was found in, inhabited, or transacted business in this District, and the acts and practices in violation of the Act occurred within this District. (Complaint, ¶ 14).

17. Section 2(c)(2)(B) and (C) of the Act, 7 U.S.C. § 2(c)(2)(B) and (C) (2002) grants the Commission jurisdiction over certain retail transactions in foreign currency that are contracts for the sale of a commodity for future delivery (or options on such contracts), and options on foreign currency, including the transactions offered by First International.

## II.

## CONCLUSIONS OF LAW

### A. The Commission Has Fraud Jurisdiction Over the Foreign Currency Option Contracts Offered to Retail Customers by First International

18. Under Section 2(c)(2)(B)(i) and (ii) and 2(c)(2)(C) of the Act, the Commission has jurisdiction over foreign currency transactions if three criteria are met: 1) the transactions at issue are futures or options contracts; 2) the futures or options contracts were offered to, or entered into with, a person that is not an eligible contact participant, i.e., retail customers; and 3) if the counterparty to the transaction is an improper counterparty, or if the counterparty is an FCM or a certain FCM affiliate and fraud or manipulation is alleged in the transaction.

6

19. In this case, First International was offering foreign currency options contracts through oral solicitations. Thus, the first criterion to establish jurisdiction is satisfied. (Complaint, ¶ 1).

20. As to the second criterion, Section 1a(12)(A)(xi) of the Act defines an eligible contract participant as either (1) an individual who has total assets in excess of ten million dollars ($10,000,000) or (2) an individual who has total assets in excess of five million dollars ($5,000,000) and who enters the transaction to manage the risk associated with the asset he owns or liability incurred. It appears that most of the customers are likely retail customers that do not meet any of the criteria for eligible contract participants. (Complaint, ¶ 10).

21. Safeguard FX, Inc., which was the initial firm that acted as a counterparty to the retail customers who First International solicited to enter into retail foreign currency option transactions, was not a proper counterparty under the Act. Subject to a reservation of limited jurisdiction set forth in Section 2(c)(2)(C) of the Act, Section 2(c)(2)(B)(ii) exempts from Commission jurisdiction retail sales of foreign currency options if the counterparty, or the person offering to be the counterparty, of the retail customer is:

> (I) a financial institution;
> (II) a broker or securities dealer or a futures commission merchant …
> (III) an associated person of a registered broker or dealer or an affiliated person of a registered futures commission merchant concerning the financial or securities activities of which the registered person makes and keeps records under Section 15C(b) or 15C of the Securities Exchange Act of 1934, or Section 4f(c)(2)(B) of the Commodity Exchange Act…
> (IV) an insurance company …
> (V) a financial holding company …
> (VI) an investment bank holding company … ."

Although Safeguard FX claimed to be an affiliate of Safeguard Financial Holdings, LLC, which was at the time a registered futures commission merchant ("FCM"), Safeguard FX did not qualify as an affiliate under Section 2(c)(2)(B)(ii)(III) of the Act because Safeguard Financial

7

Holdings LLC did not hold sufficient amounts of customer segregated funds and did not have a sufficient amount of adjusted net capital so as to be required to make and keep records pursuant to Section 4f(c)(2)(B) of the Act. Thus Safeguard FX was not an affiliate within the meaning of Section 2(c)(2)(B)(ii) of the Act and the entire Act applies to the transactions offered by or entered into with Safeguard FX. (Complaint ¶ 11).

22.     From January 2005 through at least January 2006, First International cleared its retail foreign currency option transactions through United Clearing, LLC ("United Clearing"), a registered FCM. By operation of Section 2(c)(2)(C) of the Act, the Commission retains anti-fraud jurisdiction over the First International/United Clearing foreign currency option transactions under Section 4c(b) of the Act and Regulation 32.9, which prohibits fraudulent solicitation of any off-exchange option transactions. (Complaint, ¶ 13).

**B.     First International Group, Inc. Violated Section 4c(b) and Regulation 32.9**

23.     First International defrauded prospective and actual customers by making various misrepresentations and omissions. In order to establish liability for fraud, the Commission has the burden of proving three elements: (1) the making of a misrepresentation, misleading statement, or a deceptive omission; (2) scienter; and (3) materiality. *CFTC v. R.J. Fitzgerald*, 310 F. 3d 1321, 1328 (11th Cir. 2002); *see also Hammond v. Smith Barney Harris Upham & Co.*, [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) 24,617 (CFTC Mar.1, 1990).

24.     Whether a misrepresentation has been made depends on the "overall message" of the communication and the "common understanding of the information conveyed." *R.J. Fitzgerald*, 310 F.3d at 1328; *Hammond* at 36,675 & n.12. Scienter has been found when representations are made intentionally or with a reckless disregard for the truth. *In re Slusser*, [1998-1999 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 27,701 at 48,313 (CFTC July 19,

8

1999), *aff'd in relevant part and rev'd in part sub nom.*, *Slusser v. CFTC*, 210 F. 3d 783 (7th Cir. 2000). A fact is material if a reasonable person would view the information as important in making a trading decision – in other words, as including facts significantly altering the total mix of information already in his possession. *R.J. Fitzgerald*, 310 F. 3d at 1328. Such actionable misrepresentations include those made to First International's customers in the course of the solicitation, opening or maintenance of their foreign currency options accounts. *CFTC v. Rosenberg,* 85 F.Supp.2d 424, 447-448 (D.N.J. 2000); *Saxe v. E. F. Hutton & Co., Inc.*, 789 F. 2d 105, 110-111 (2d Cir. 1986); *Hirk v. Agri-Research Council Inc.*, 561 F. 2d 96, 103-104 (7th Cir. 1977).

25. The conduct of First International representatives whereby they provided projections of significant and quick profits to customers while soliciting their account, while the representatives failed to disclose the material fact that the vast majority of First International customers closed their foreign currency option trading accounts at a loss, and typically a substantial loss, also constituted fraudulent conduct that violated Section 4c(b) of the Act, 7 U.S.C. § 6c(b) and Commission Regulation 32.9, 17 C.F.R. § 32.9. *CFTC v. R.J. Fitzgerald*, 310 F. 3d 1321, 1331-1332 (11th Cir. 2002). First International acted with the required scienter when they failed to disclose this material information to customers because they either knew that the overwhelming majority of First International customers closed their accounts at a loss, or they recklessly failed to determine whether there was a reasonable basis in fact for the extraordinary claims of profit potential that they made to customers. (Complaint, ¶¶ 31-34, 39).

26. From at least June 2004 through January 2006, defendant First International, directly or indirectly, in or in connection with accounts, agreements, contracts, or transactions that were subject to the CFTC's jurisdiction pursuant to Section 2(c)(2)(B) of the Act, 7 U.S.C.

9

§ 2(c)(2)(B), violated Section 4c(b) of the Act, 7 U.S.C. § 6c(b) and Commission Regulation 32.9 in that they cheated or defrauded or attempted to cheat or defraud other persons by, among other things: (a) misrepresenting the profits and risk of loss in connection with foreign currency options transactions; and (b) while making projections of significant and likely profits, failing to disclose the material fact that the vast majority of First International customers closed their foreign currency trading accounts at a loss.

27.   The actions and omissions of First International representatives described above were done within the scope of their employment with First International, and therefore First International is liable as a principal for each of the violations committed by First International's representatives. (Complaint, ¶ 40).

C.   **First International Violated Commission Regulation 1.1(b)(1) and (3)**

28.   During the period of time from approximately June 2004 through January 2005 that First International introduced its foreign currency options customers to Safeguard FX, First International also violated Commission Regulations 1.1(b)(1) and 1.1(b)(3).

D.   **Permanent Injunction**

29.   Section 6c of the Act, 7 U.S.C. § 13a-1 (2002), authorizes and directs the Commission to enforce the Act and Regulations. In an action for permanent injunctive relief, the Commission is not required to make a specific showing of irreparable injury or inadequacy of other remedies, which private litigants must make. *CFTC v. Muller,* 570 F.2d 1296, 1300 (5th Cir. 1978); *United States v. Quadro Corp.,* 928 F. Supp. 688, 697 (E.D. Tex. 1996) (citations omitted), *aff'd, U.S. v. Quadro Corp.,* 127 F.3d 34 (5th Cir, 1997); *CFTC v. British Am. Commodity Options Corp.,* 560 F.2d 135, 141-42 (2nd Cir. 1977), *cert. denied* 438 U.S. 905 (1978).

30. The Plaintiff makes the requisite showing for issuance of injunctive relief when it presents a *prima facie* case that the defendant has engaged, or is engaging, in illegal conduct, and that there is a likelihood of future violations. *CFTC v. American Bd. of Trade, Inc.*, 803 F.2d 1242, 1250-51 (2d Cir. 1986); *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979), *cert. denied*, 442 U.S. 921 (1979).

31. In a Commission enforcement case, it has been held that the district court's finding that there was the likelihood of future violations supported its entry of a permanent injunction, *CFTC v. Sidoti,* 178 F.3d 1132 (11th Cir. 1999). In *Sidoti,* the 11th Circuit stated: "In light of the likelihood of future violations, the district court did not abuse its discretion in enjoining further violations of the CEA." *See SEC v. Carriba Air, Inc.* 681f.2d 1381, 1322 (11th Cir.1982); *SEC v. Blatt* 583 F.2d 1325, 1334 (5th Cir. 1978)." *Sidoti* at 1137. Whether such a likelihood of future violations exists depends on the "totality of the circumstances." *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 807 (2d Cir. 1975); *CFTC v. Morgan, Harris & Scott, Ltd.*, 484 F. Supp. 669, 676 (S.D.N.Y. 1979). Foremost among these circumstances is the past illegal conduct of the defendant, from which courts may infer a likelihood of future violations. *CFTC. v. British Am. Commodity Options Corp.*, 560 F.2d at 142; *SEC v. Management Dynamics, Ltd.*, 515 F.2d at 807; *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1322 (11th Cir. 1982).

32. The scope of the injunctive relief can be tailored to meet the circumstances of the violations shown. For example, courts have entered permanent injunctions against future violations of the Act upon the Commission's showing of a violation and likelihood of future violations. *See, e.g., CFTC v. U.S. Metals Depository Co.*, 468 F.Supp.1149 (S.D.N.Y. 1979). Other courts have issued broader injunctions prohibiting trading activity. *CFTC v. Noble Wealth*